IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO. 7:25-CV-000973-D-BM

| | | |
|---|---|---|
| JASON HEWETT, individually and on behalf of all others similarly situated, | ) ) | |
| | ) | DECLARATION OF KELLY |
| Plaintiff, | ) | MARGOLIS DAGGER |
| | ) | |
| v. | ) | |
| | ) | |
| ENJOY THE CITY NORTH, INC. d/b/a SAVEAROUND, | ) ) | |
| | ) | |
| Defendant. | ) | |

I, Kelly Margolis Dagger, pursuant to the provisions of 28 U.S.C. § 1746, declare as follows:

1. My name is Kelly Margolis Dagger. I have personal knowledge of the matters set forth below, except where I am relying on documents, in which case I have described the content of such documents.

2. I am a partner in the law firm of Ellis & Winters LLP and counsel of record for Defendant Enjoy the City North, Inc. d/b/a SaveAround ("SaveAround") in the above-captioned action.

3. Exhibit 1 to this declaration is a true and correct copy of a letter I received from Mr. Hewett's counsel, Andrew Perrong, on October 31, 2025, except that we redacted all but the last four digits of Mr. Hewett's phone number. Mr. Hewett's counsel wrote that he had obtained a forensic image of Mr. Hewett's cell phone. He wrote that he had reviewed Mr. Hewett's entire web history, and there was no record of a visit to SaveAround's website; in fact, there was a

"gap" in Mr. Hewett's web history between October 11 and 16, 2024. [DE 33-1] 2.[1]

Mr. Hewett's counsel said that the web history "reflects that his device likely was off between the evening of October 11 and the morning of October 16, 2024." Id. In addition, Mr. Hewett's counsel wrote that Mr. Hewett "has no record of receiving the claimed verification text message with the code . . . ." Id. at 3. The letter included a screenshot of Mr. Hewett's text messages from (855) 983-0131, the number that sent the SaveAround text messages. Id. According to the screenshot, Mr. Hewett first received a message from that number on October 15, 2024, at 10:24:03 AM (UTC-5). Id. Also according to the screenshot, that message was the only one Mr. Hewett received from that number on October 15, 2024. Id. The displayed message matched the third message in Postscript's records, making it appear that Mr. Hewett had not received the first two messages: a verification code and a welcome message. See [D.E. 21-4] 2. Mr. Hewett, through counsel, demanded a payment of $75,000 from SaveAround to resolve his claims. [DE 33-1] 4.

4. On November 5, 2025, I responded to Mr. Perrong by email as follows:

> We have reviewed the settlement demand with SaveAround. SaveAround believes the case is meritless. SaveAround intends to vigorously defend the case, including pursuing any available counterclaims and avenues for shifting of fees. SaveAround will agree to resolve the case with mutual releases of all potential claims, dismissal of the existing complaint, and Mr. Hewett's payment of $50,000 to SaveAround. Please let us know if you'd like to discuss further.

5. On November 6, 2025, Mr. Perrong responded, "We have presented your counter to our client, who has rejected it."

---

[1] Pinpoint citations are to CM/ECF pagination.

6.	Exhibit 2 to this declaration is a true and correct copy of Mr. Hewett's responses to SaveAround's first set of discovery requests, served on November 17, 2025, except that we redacted Mr. Hewett's email addresses and all but the last four digits of Mr. Hewett's phone number.  Mr. Hewett stated in response to Interrogatory No. 6 that no one else had access to his phone during the relevant time period (October 1, 2024, through May 31, 2025).  [DE 33-2] 5.  In response to Interrogatory No. 11, he stated that he "does not recall deleting any text messages, browser history, or browser applications" between October 1, 2024, and the present.  Id. at 7-8.  In response to Interrogatory No. 14, Mr. Hewett identified six TCPA lawsuits, including this one, he has filed since December 2022.  Id. at 9.  In response to Requests for Production Nos. 4, 5, 6, 7, and 8, Mr. Hewett refused to produce his web browser history or call records, and refused to produce his cell phone for forensic examination.  Id. at 13-18.  In response to Requests for Admission Nos. 4 and 5, Mr. Hewett denied receiving or using a verification code to sign up for messages.  Id. at 21-22.

7.	Exhibit 3 to this declaration is a true and correct copy of Mr. Hewett's responses to SaveAround's second set of discovery requests, served on December 8, 2025.  In response to Requests for Production Nos. 17 and 18, Mr. Hewett refused to produce his cell phone for forensic examination of his text messages and web browser history.  [DE 33-3] 2-7.  In response to Request for Production No. 19, he also refused to produce the forensic image of his phone referred to in his counsel's letter of October 31, 2025.  Id. at 7-10.

8.	In response to SaveAround's requests for production, Mr. Hewett produced screenshots of what he said were the only SaveAround text messages he received.  The messages did not include the first two messages recorded in Postscript's records.

9. I issued a subpoena to T-Mobile for subscriber records associated with Mr. Hewett's telephone number. T-Mobile responded to the subpoena on December 18, 2025. This production included a business records certification and a guide to interpretation of cell phone records. Exhibit 4 to this declaration is a true and correct copy of that certification, except that we redacted all but the last four digits of Mr. Hewett's phone number, with the relevant portion of the interpretation guide attached. T-Mobile also produced call detail records for Mr. Hewett's phone number. The complete copy of the call detail records is 577 pages when printed. For brevity, I created an excerpt on the call detail records including only the first page and the pages showing the calls and text messages (SMSC) Mr. Hewett sent and received between October 11 and 16, 2024. Exhibit 5 to this declaration is a true and correct copy of that excerpt, except that we redacted all but the last four digits of Mr. Hewett's phone number, all IMSI and IMEI numbers, and all phone numbers Mr. Hewett communicated with other than (a) the outgoing number associated with the SaveAround text messages, (855) 983-0131, and (b) the phone number (202) 234-2727, which is publicly available on the website of the Heidarpour Law Firm.

10. T-Mobile's records reflect that Mr. Hewett sent and received numerous text messages, and made and answered numerous phone calls, between October 11 and 16, 2024. Among other things, the T-Mobile records show that Mr. Hewett texted the number (202) 234-2727 (a) on October 12, 2024, at 21:13:53 UTC, [D.E. 33-5] 5; (b) on October 15, 2024, eight times between 20:49:51 and 22:29:27 UTC, id. at 9-10; and (c) on October 16, 2024, twenty-seven times between 12:52:30 UTC and 23:58:04 UTC, id. at 10-14. Mr. Hewett's pre-suit demand letter to SaveAround was from the Heidarpour Law Firm. The telephone number on the law firm's letterhead and current website is (202) 234-2727. Although no lawyer from the

Heidarpour Law Firm has entered an appearance in this case, the Heidarpour Law Firm served Mr. Hewett's discovery responses on December 8, 2025. The T-Mobile records thus reflect that Mr. Hewett was in active communication with at least part of his legal team during the time his counsel said his phone was likely off.

11. The T-Mobile records also show that, on October 15, 2024, Mr. Hewett received three text messages from (855) 983-0131, at 15:23:42 UTC, 15:23:59 UTC, and 15:24:00 UTC. [D.E. 33-5] 8. These records align with the records of Postscript, SaveAround's vendor for sending marketing text messages to individuals who sign up to receive messages. The Postscript records show that Mr. Hewett was sent three messages from that number on October 15, 2024: (a) a text message with a verification code at 15:23:41 UTC, (b) a welcome message explaining how to stop receiving messages at 15:23:58 UTC; and a (c) a message offering a discount, identical to that displayed as the first message in Mr. Hewett's screenshot, at 15:23:59 UTC. See [D.E. 21-4] 2. Each message is shown as received one second later in the T-Mobile records. [D.E. 33-5] 8.

12. Exhibit 6 to this declaration is a true and correct copy of a letter I sent to Mr. Hewett's counsel on December 20, 2025, redacted to remove Mr. Hewett's complete phone number. I explained that the T-Mobile records showed that Mr. Hewett's phone was on between October 11 and 16, 2024, that they matched the Postscript records, and that they showed that Mr. Hewett indeed received the verification code. [D.E. 33-6] 2-3. I wrote, "Based on the representations of counsel in the October 31, 2025, letter, and the records from Postscript and T-Mobile, the only reasonable conclusion is that Mr. Hewett deleted evidence that he opted in to receive SaveAround text messages." Id. at 3. I relayed a settlement demand from SaveAround for Mr. Hewett to pay SaveAround $100,000. Id.

13. At 5:02 pm on December 22, 2025, I received a phone call from Mr. Hewett's counsel, Andrew Perrong. According to my cell phone carrier records, which are consistent with my recollection, the call lasted four minutes. Mr. Perrong commented to the effect that the T-Mobile records were inconclusive because they did not include the content of the text messages Mr. Hewett received through Postscript. He also indicated that Mr. Hewett was unable to pay SaveAround's fees. Mr. Perrong suggested that the parties resolve the case without payment in either direction. I told him I would discuss that idea with my client. I do not recall any discussion of other settlement terms.

14. Exhibit 7 to this declaration is a true and correct copy of my email correspondence with Andrew Perrong between December 23, 2025, and February 13, 2026. The communications described below are part of this email chain.

15. On December 30, 2025, I emailed Mr. Perrong:

> SaveAround is willing to settle the case on the terms we understand Mr. Hewett to have proposed: no money changing hands, a complete release, and dismissal with prejudice. Please let me know if you will send us a draft settlement agreement. If not, we will prepare one. In the meantime, we would like to stop working on the case. Our deadline to disclose experts is January 7. Will Mr. Hewett agree to push that deadline to January 21 to allow time to finalize the settlement? That will allow us to stop work. If something should fall through, we can ask the court to reset the discovery schedule.

[D.E. 33-7] 9.

16. Mr. Perrong responded, "Yes, we will agree to push the deadline." Id. I wrote, "Thanks. Please let me know about drafting the agreement when you have a chance." Id. He responded, "I should have a form, but will let you know otherwise." Id. at 8.

17. My usual practice is to notify the Court when the parties have reached a settlement and inform the Court of the expected timeline for the preparation and execution of a

written settlement agreement and the eventual filing of a stipulation of dismissal. I did not notify the Court of settlement because, in my view, we had not reached a settlement. As far as I am aware, Mr. Perrong did not notify the Court of settlement. In my December 30, 2025, email to Mr. Perrong, I suggested that something could "fall through," requiring us to "reset the discovery schedule," id. at 9, because I was not certain whether the parties would be able to come to agreement on all terms of a settlement agreement. My client was interested in trying to do so, and I wanted to stop working on the case while trying to negotiate a settlement so that my client would not unnecessarily incur attorneys' fees if we were successful in settling. If we did not settle, however, I did not want my client to be prejudiced by missed discovery deadlines.

18. On December 30, 2025, at 12:22 pm, Mr. Perrong responded, "Please see attached." Id. at 8. He attached a proposed settlement agreement. Exhibit 8 to this declaration is a true and correct copy of that proposed settlement agreement.

19. Paragraph 8 of the December 30 proposed settlement agreement we received from Mr. Perrong was entitled "Confidentiality and Non-Disparagement." The last sentence of that paragraph reads, "The Parties agree that this paragraph is an essential and material part of this Agreement." [D.E. 33-8] 4.

20. On January 5, 2026, my colleague, Marie Scheperle, responded to Mr. Perrong, "Please see SaveAround's counter proposed terms attached. If these terms are acceptable to your client, we will sign." [D.E. 33-7] 8. Ms. Scheperle attached a proposed settlement agreement showing revisions in Word's "track changes" feature. Exhibit 9 to this declaration is a true and correct copy of SaveAround's January 5 proposed settlement agreement. Among other changes, SaveAround's counsel had stricken paragraph 8 from the December 30 proposed settlement agreement received from Mr. Perrong. [D.E. 33-9] 4.

21. On January 6, 2026, Mr. Perrong wrote back, "Please see attached with our further edits and comments." [D.E. 33-7] 8. He attached a proposed settlement agreement with revisions comment bubbles. Exhibit 10 to this declaration is a true and correct copy of that proposed settlement agreement. In Mr. Hewett's January 6 proposed settlement agreement, paragraph 8 had been reinstated. [D.E. 33-10] 4. The last sentence of that paragraph reads, "The Parties agree that this paragraph is an essential and material part of this Agreement." Id. In a comment bubble appended to paragraph 8, Mr. Hewett's counsel wrote: "Confidentiality and non-disparagement are both mutual and necessary terms of this Agreement. Plaintiff is unwilling to sign a non-confidential agreement." Id.

22. On January 7, 2026, I wrote to Mr. Perrong:

> SaveAround is fine with the edits in sections 1 and 2, but SaveAround is not willing to agree to confidentiality and non-disparagement terms. Those terms were not part of our initial discussion, and SaveAround is only willing to compromise and give up its right to seek monetary recovery from Mr. Hewett if the settlement leaves both parties free to speak truthfully about the matter. I understand Mr. Hewett's position is that he did not opt in to text messages, but SaveAround believes that position is provably false. I am happy to discuss if there is some other compromise Mr. Hewett wishes to propose.

[D.E. 33-7] 7.

23. On January 10, 2026, Mr. Perrong responded:

> I understand that the parties desire to "speak truthfully about the matter," but the truth of this agreement is that both parties expressly deny any wrongdoing and have entered into the agreement as a compromise only of disputed claims, including the claim that the Plaintiff ever opted in or provided his consent. So to the extent that your client desires to speak of the agreement beyond those terms therein, that would be the extent to which your client could be said to "speak truthfully" about the matter. We are amenable to removal of the nondisparagement portion and revision of the confidentiality provision to permit the parties to disclose that they entered into a settlement of disputed claims, solely to resolve by compromise

certain disputes in the litigation, and that each party denies the other's claims and defenses and any wrongdoing, or language to that effect. If this is agreeable in principle, let me know together with the terms of the provision that you propose.

Id.

24. Mr. Perrong and I exchanged non-substantive emails as we waited for SaveAround's direction in response to Mr. Perrong's January 10 email.

25. On February 11, 2026, I emailed Mr. Perrong:

SaveAround is not willing to agree to the proposed confidentiality provision, so it rejects the settlement proposal. I know we took some time to get back to you, and we are certainly willing to discuss any necessary deadline extensions resulting from that delay. Please let me know if you think you need more time for discovery.

We would like to take Mr. Hewett's deposition in the near term. Are you able to produce him on either February 23, 25, or 26? We are flexible on the location. If we do the 25th, we would ask to do it remotely. We can be available in person or remotely on February 23 or 26.

Id. at 5.

26. Also on February 11, 2026, Mr. Perrong responded, "Let me talk to the client first. Would your client be amenable to signing the agreement you circulated on January 5 if I could get him to agree to the same?" Id.

27. I replied, "I don't know, but if your client says he will agree to it, I will take that proposal back to my client." Id. at 4.

28. On February 12, 2026, Mr. Perrong wrote, "Our client will[.]" Id.

29. I relayed this offer to SaveAround. Although Mr. Hewett was now saying, for the first time, that he would agree to a non-confidential settlement, SaveAround was no longer willing to settle after Mr. Hewett's repeated rejections and insistence on confidentiality.

SaveAround rejected Mr. Hewett's request to revive the January 5 settlement offer.  Therefore, on February 13, 2026, I wrote to Mr. Perrong:

> SaveAround is no longer willing to go back to a zero settlement and give up the right to seek sanctions.  SaveAround is willing to negotiate a number that Mr. Hewett can pay to avoid a motion for sanctions.  I understand from our discussions that he may not have the ability to pay all the fees SaveAround has incurred, and I think my client will take that into account in evaluating any offer he may make.
>
> Can you please let me know about the February deposition dates?

Id.

30.     On the same day, Mr. Perrong responded:

> It was our understanding that we had an agreement in principle and we intend to move to enforce the basic terms of that agreement. Please advise if your client will sign the agreement that you sent to avoid unnecessary motion practice or if it will instead continue in taking this position.

Id. at 3.

31.     I replied to Mr. Perrong:

> Our client was willing to agree to a zero-dollar settlement with no confidentiality provision, but Mr. Hewett rejected that offer by insisting on confidentiality, which our client never accepted.  Our client is not willing to go back to the original offer at this point, and has chosen to continue litigation.  I will inform my client of the threat to file a motion to enforce the alleged settlement agreement, but I expect SaveAround to oppose that motion for the reasons I just explained.

Id. (emphasis in original).

32.     Mr. Perrong replied:

> The material terms of the agreement which were offered and accepted were a mutual dismissal of claims with prejudice.  That we did not agree on a certain non-material contractual terms in the text of the agreement itself, which we then subsequently accepted your proposal, does not change the fact that we had an offer and

acceptance of the essence of the bargain as described above that we will enforce.

Id. at 2-3.

33.	I advised Mr. Perrong that SaveAround disagreed and would oppose the motion to enforce settlement agreement.  Id. at 2.

34.	SaveAround and Mr. Hewett never signed a settlement agreement or memorandum of understanding in any form.

I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this the 17th day of March, 2026.

_____
Kelly Margolis Dagger