IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
CIVIL ACTION NO. 7:25-CV-000973-D-BM

| | | |
|---|---|---|
| JASON HEWETT, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | DEFENDANT SAVEAROUND'S BRIEF IN OPPOSITION TO PLAINTIFF'S |
| v. | ) ) | MOTION TO ENFORCE SETTLEMENT AGREEMENT |
| ENJOY THE CITY NORTH, INC. d/b/a SAVEAROUND, | ) ) ) | |
| Defendant. | ) ) | |

Defendant Enjoy the City North, Inc. d/b/a SaveAround ("SaveAround"), through

counsel, hereby responds in opposition to Plaintiff's Motion to Enforce Settlement Agreement or,

in the Alternative, for Dismissal [D.E. 29].

## INTRODUCTION

When Jason Hewett, a serial Telephone Consumer Protection Act plaintiff, sent

SaveAround a pre-suit demand letter complaining that he received SaveAround marketing text

messages, SaveAround warned Mr. Hewett's lawyers that he had signed up for text messages and

provided the details of the opt-in process Mr. Hewett used. Mr. Hewett nevertheless sued

SaveAround for alleged violation of the TCPA and its state law counterpart, denied receiving the

text messages that prove he opted in, and demanded $75,000 to drop the case.

After SaveAround obtained records from Mr. Hewett's cell phone carrier confirming

SaveAround's version of events and demanded payment from Mr. Hewett for defending his

meritless lawsuit, Mr. Hewett's counsel suggested that the parties settle without a payment in

either direction. SaveAround was interested, so SaveAround's counsel sent Mr. Hewett's

counsel an email summarizing the general terms on which SaveAround was willing to settle and

asked Mr. Hewett to draft a settlement agreement. The parties agreed to extend a discovery deadline, and counsel for SaveAround noted that the parties could ask the Court to reset the discovery schedule if settlement fell through.

The parties exchanged drafts of a proposed settlement agreement, but they never reached agreement. Mr. Hewett rejected SaveAround's settlement offers by repeatedly insisting on non-disparagement and confidentiality terms, which he expressly characterized as material. His counsel told SaveAround's counsel: "Plaintiff is unwilling to sign a non-confidential agreement."

When SaveAround informed Mr. Hewett that it would not agree to confidentiality and thus it was rejecting his settlement proposal, Mr. Hewett's counsel asked if SaveAround would agree to sign one of SaveAround's prior settlement proposals, "if I could get [Mr. Hewett] to agree to the same." When Mr. Hewett came around and said he would accept the previously rejected proposal, SaveAround said no. Then, for the first time, Mr. Hewett asserted that SaveAround had no choice because the parties had already reached a binding settlement. Mr. Hewett's motion to enforce settlement followed.

Contrary to Mr. Hewett's assertions, the parties never formed a contract. The parties discussed the general terms and agreed to delay discovery while attempting to reach a settlement. Then, each time SaveAround made a settlement offer, Mr. Hewett rejected it by demanding different terms. SaveAround was under no obligation to revive its prior offer when Mr. Hewett apparently regretted having rejected it. And, if even Mr. Hewett could show that the parties reached agreement, he repudiated it. Mr. Hewett's motion to enforce settlement agreement is properly denied.

2

To the extent Mr. Hewett seeks in the alternative to dismiss his case with prejudice, SaveAround does not object to that relief.  However, Mr. Hewett's effort to impose terms on dismissal "according to the terms of the parties' agreement, including releases of claims with no monetary payment," is another way of asking the Court to enforce an agreement the parties never reached.  Any relief is properly limited to dismissing Mr. Hewett's claims with prejudice.

## STATEMENT OF RELEVANT FACTS

Mr. Hewett's request to receive SaveAround messages

SaveAround sells coupon books.  Acquisto Decl. [D.E. 21-1] ¶ 2 (unredacted version filed at [D.E. 22-1]).  Cellphone users can sign up to receive discounts on coupon books through SMS text message by enrolling a cellphone number through a pop-up on the SaveAround website.  Id. at ¶ 3; Carter Decl. [D.E. 21-2] ¶¶ 4–5 (unredacted version filed at [D.E. 22-2]).

SaveAround partners with Stodge, Inc. d/b/a Postscript ("Postscript") for SMS marketing services and only sends text messages through Postscript.  Acquisto Decl. ¶¶ 3–4.  Postscript hosts pop-ups on the SaveAround website enabling visitors to sign up for text messages.  Carter Decl. ¶¶ 4–5.  Postscript transmits SaveAround's messages only to users who sign up by (1) entering a cellphone number in a pop-up, and (2) subsequently verifying, from the mobile device to which the number is assigned, that the user wishes to sign up.  Id. at ¶¶ 11–13.

On October 15, 2024, a user signed up to receive SaveAround marketing text messages by entering a cellphone number in a pop-up.  Carter Decl. ¶ 7.  The pop-up offered a 10% discount for signing up for text messages and stated:

> By providing your phone number, you agree to receive recurring automated marketing text messages (e.g., cart reminders) from this shop and third parties acting on its behalf.  Consent is not a condition to obtain goods or services.  Msg & data rates may apply.  Msg frequency varies.  Reply HELP for help and STOP to cancel.  You also agree to the TERMS OF SERVICE and PRIVACY POLICY.

3

Id. at ¶ 8.

The pop-up offered two choices: "Text Me The Discount Code" or "No thank you." Id. at ¶ 10. After entering a (910) number,[1] the user clicked "Text Me The Discount Code." Id. at ¶ 15; see id. at ¶¶ 11–14. Postscript's system transmitted a message: "SaveAround: Your verification code is: 3965. Enter this code in the pop-up, or reply 'Y' to this text to finish signing up." Id. at ¶ 16. The user entered "3965" in the pop-up. Id. at ¶¶ 17–18; see [D.E. 21-3]. Shortly thereafter, Postscript's system sent two more text messages. Carter Decl. ¶ 19.

Between October 15, 2024, and April 17, 2025, Postscript's system transmitted SaveAround messages to the (910) number. Id. at ¶ 20. The user never texted "STOP." Id. at ¶ 21; see [D.E. 21-4] (unredacted version filed at [D.E. 22-3]).

On April 22, 2025, Mr. Hewett's counsel sent SaveAround a letter alleging TCPA violations based on the messages sent to the (910) number. Acquisto Decl. ¶ 6. SaveAround responded that Mr. Hewett had consented to receive the messages on that number. Id. at ¶¶ 7–8.

Mr. Hewett's lawsuit

On May 21, 2025, Mr. Hewett filed a complaint, individually and on behalf of two proposed classes, against SaveAround, alleging violations of the TCPA and the NCTSA. Compl. [D.E. 1] ¶¶ 16–50. Mr. Hewett alleges that, from October 15, 2024, and onward, he received "at least twenty seven telemarketing text messages" from SaveAround to his personal phone number, although his number was on the Do Not Call Registry. Id. at ¶¶ 18–19, 23–25. Mr. Hewett alleges that he never consented to or requested the messages, and thus SaveAround violated the TCPA and NCTSA by sending them. Id. at ¶¶ 17, 31, 43–45, 49.

---

[1] SaveAround avoids using the complete phone number in this brief or its exhibits, as it understands that Mr. Hewett contends that the number should not be public. The complete number is shown in SaveAround's previously filed sealed exhibits. See [D.E. 22-1, -2, -3].

4

SaveAround answered and asserted defenses, including that Mr. Hewett gave express invitation or permission to receive SaveAround's text messages. Answer [D.E. 16] 8–10.

Early settlement discussions

On October 20, 2025, this Court entered a scheduling order. [D.E. 20]. Over Mr. Hewett's objection, SaveAround moved to stay class discovery. [D.E. 21].

Upon receiving SaveAround's motion, Mr. Hewett demanded $75,000 to settle the case. Dagger Decl. [D.E. 33] ¶ 3; 10/31/2025 Letter from A. Perrong to K. Dagger [D.E. 33-1] 4.[2] Mr. Hewett's counsel wrote that a forensic image of Mr. Hewett's phone showed that the phone "likely was off" on October 15, 2024, when the phone number was signed up for SaveAround text messages, and surrounding days. [D.E. 33-1] 2. Mr. Hewett denied receiving the first two text messages Postscript sent, including the verification code message. Id. at 3.

SaveAround rejected the settlement demand. Dagger Decl. ¶ 4. SaveAround explained that the case was meritless and it would pursue recovery of attorneys' fees; however, it offered to resolve the case if Mr. Hewett paid SaveAround $50,000. Id. Mr. Hewett declined. Id. at ¶ 5.

Written discovery

The Court entered an order limiting discovery to Mr. Hewett's individual claims and staying class discovery. [D.E. 26].

The parties took written discovery. See Pl.'s Resps. to Def.'s First Set of Discovery Requests [D.E. 33-2]; Pl.'s Resps. to Def.'s Second Set of Discovery Requests [D.E. 33-3]. Mr. Hewett admitted that no one else had access to his phone during the relevant time and said he did not recall deleting any text messages or browser history. Dagger Decl. ¶ 6; [D.E. 33-1] 3, 5, 7–8. He refused to produce his browser history or cell phone records, to produce his phone for

---

[2] Pinpoint citations are to CM/ECF pagination.

examination, or to share the forensic image his counsel referred to in the demand letter. Dagger Decl. ¶¶ 6–7; [D.E. 33-2] 13–15, 17–18; [D.E. 33-3] <u>passim</u>. He produced screenshots purporting to show all SaveAround text messages he received. Dagger Decl. ¶ 8. Those screenshots did not include the first two messages from the Postscript records. <u>Id.</u>

SaveAround obtained T-Mobile records showing that Mr. Hewett transmitted and received calls and text messages, including to one of his law firms, during the time his counsel said that his phone likely was off. <u>Id.</u> at ¶¶ 9–10. The T-Mobile records showed that Mr. Hewett received the verification code and confirmatory text messages from Postscript's system, as SaveAround had said all along. <u>Id.</u> ¶ 11; <u>see</u> T-Mobile Records Excerpt [D.E. 33-5] 3-14.

<u>Renewed settlement discussions</u>

On December 20, 2025, SaveAround's counsel wrote to Mr. Hewett's counsel that, based on Mr. Hewett's counsel's representations and the Postscript and T-Mobile records, "the only reasonable conclusion is that Mr. Hewett deleted evidence that he opted in to receive SaveAround text messages." Dagger Decl. ¶ 12; 12/20/2025 Letter from K. Dagger to A. Paronich, <u>et al.</u> [D.E. 33-6] 3. SaveAround offered to "resolve the case and forgo any formal effort to recover its litigation costs" in exchange for a payment of $100,000 and Mr. Hewett's dismissal of his claims with prejudice. [D.E. 33-6] 3.

On December 22, 2025, in a four-minute call to SaveAround's counsel, Mr. Hewett's counsel suggested that the parties resolve the case without payment. Dagger Decl. ¶ 13.

On December 30, 2025, SaveAround's counsel emailed Mr. Hewett's counsel:

SaveAround is <u>willing</u> to settle the case on the terms we understand Mr. Hewett to have proposed: no money changing hands, a complete release, and dismissal with prejudice. Please let me know if you will send us a draft settlement agreement. If not, we will prepare one. In the meantime, we would like to stop working on the case. Our deadline to disclose experts is January 7. Will Mr. Hewett agree to push that deadline to January 21 to allow time to finalize the settlement? That will allow

6

us to stop work.  If something should fall through, we can ask the court to reset the discovery schedule.

Id. at ¶ 15 (emphases added); Email Correspondence [D.E. 33-7] 9.  Mr. Hewett's counsel responded, "Yes, we will agree to push the deadline."  Dagger Decl. ¶ 16; [D.E. 33-7] 9.  The parties did not notify the Court of settlement.  Dagger Decl. ¶ 17.

Mr. Hewett's counsel sent a proposed settlement agreement.  Id. at ¶ 18; see 12/30/2025 Hewett Proposed Settlement Agreement [D.E. 33-8].  The proposed agreement contained a paragraph that would require the parties to keep the terms "strictly confidential" and refrain from disparaging the other party.  [D.E. 33-8] 4.  This provision also stated:  "The Parties agree that this paragraph is an essential and material part of this Agreement."  Id.; see Dagger Decl. ¶ 19.

On January 5, 2026, SaveAround's counsel responded with "SaveAround's counter proposed terms."  Dagger Decl. ¶ 20; [D.E. 33-7] 8.  SaveAround's counsel enclosed a proposed settlement agreement with revisions, including the removal of the confidentiality and non-disparagement paragraph.  1/5/2026 SaveAround Proposed Settlement Agreement [D.E. 33-9] 4.

On January 6, 2026, Mr. Hewett sent another proposed settlement agreement.  Dagger Decl. ¶ 21; [D.E. 33-7] 8.  Mr. Hewett reinserted the confidentiality and non-disparagement paragraph, including the statement that "this paragraph is an essential and material part of this Agreement."  1/6/2026 Hewett Proposed Settlement Agreement [D.E. 33-10] 4.  In a comment bubble accompanying that paragraph, Mr. Hewett's counsel wrote:  "Confidentiality and non-disparagement are both mutual and necessary terms of this Agreement.  Plaintiff is unwilling to sign a non-confidential agreement."  Id.; see Dagger Decl. ¶ 21.

On January 7, 2026, SaveAround's counsel advised Mr. Hewett's counsel that SaveAround "is not willing to agree to confidentiality and non-disparagement terms."  Dagger Decl. ¶ 22; [D.E. 33-7] 7.  SaveAround's counsel explained that "[t]hose terms were not part of

7

our initial discussions, and SaveAround is only willing to compromise and give up its right to seek monetary recovery from Mr. Hewett if the settlement leaves both parties free to speak truthfully about the matter." Dagger Decl. ¶ 22. SaveAround's counsel offered to "discuss if there is some other compromise Mr. Hewett wishes to propose." Id.

On January 10, 2026, Mr. Hewett's counsel responded:

> We are amenable to removal of the nondisparagement portion and revision of the confidentiality provision to permit the parties to disclose that they entered into a settlement of disputed claims, solely to resolve by compromise certain disputes in the litigation, and that each party denies the other's claims and defenses and any wrongdoing, or language to that effect. If this is agreeable in principle, let me know together with the terms of the provision that you propose.

Id. at ¶ 23 (emphasis added); [D.E. 33-7] 7.

On February 11, 2026, SaveAround's counsel responded that "SaveAround is not willing to agree to the proposed confidentiality provision, so it rejects the settlement proposal." Dagger Decl. ¶ 25; [D.E. 33-7] 5. Counsel acknowledged that SaveAround had taken some time to respond, and she offered to discuss deadline extensions. Dagger Decl. ¶ 25. She also requested a date to take Mr. Hewett's deposition. Id.

Mr. Hewett's counsel responded: "Let me talk to the client first. Would your client be amenable to signing the agreement you circulated on January 5 if I could get him to agree to the same?" Id. at ¶ 26; [D.E. 33-7] 5. SaveAround's counsel responded, "I don't know, but if your client says he will agree to it, I will take that proposal back to my client." Dagger Decl. ¶ 27.

On February 12, 2026, Mr. Hewett's counsel confirmed that his client was willing to agree to SaveAround's January 5 settlement offer. Id. at ¶ 28; [D.E. 33-7] 4.

Although, weeks earlier, SaveAround had been willing to settle and give Mr. Hewett a release as reflected in the January 5 settlement offer, Mr. Hewett's repeated insistence on

confidentiality soured SaveAround's view.  <u>See</u> Dagger Decl. ¶ 29.  On February 13, 2026, SaveAround rejected Mr. Hewett's proposal:

> SaveAround is no longer willing to go back to a zero settlement and give up the right to seek sanctions.  SaveAround is willing to negotiate a number that Mr. Hewett can pay to avoid a motion for sanctions.  I understand from our discussions that he may not have the ability to pay all the fees SaveAround has incurred, and I think my client will take that into account in evaluating any offer he may make.  Can you please let me know about the February deposition dates?

<u>Id.</u>; [D.E. 33-7] 3–4.

In response—and for the first time in the parties' negotiations—Mr. Hewett's counsel asserted that "[i]t was our understanding that we had an agreement in principle and we intend to move to enforce the basic terms of that agreement."  Dagger Decl. ¶ 30; [D.E. 33-7] 3.  SaveAround's counsel responded that Mr. Hewett had rejected SaveAround's January 5 offer by insisting on confidentiality and SaveAround was not willing to reinstate that offer.  Dagger Decl. ¶¶ 31–33.  Mr. Hewett's motion to enforce settlement agreement followed.  <u>See</u> [D.E. 29].

## <u>LEGAL STANDARD</u>

Courts possess inherent authority to enforce settlement agreements, but settlements are "appropriate only when the parties have actually reached an agreement."  <u>Hensley v. Alcon Lab'ys, Inc.</u>, 277 F.3d 535, 540 (4th Cir. 2002) (citing <u>Millner v. Norfolk & W. Ry. Co.</u>, 643 F.2d 1005, 1009 (4th Cir. 1981)).  When reviewing a motion to enforce a settlement agreement, courts apply standard state law contract principles.  <u>Id.</u>; <u>accord</u> <u>Powell v. City of Newton</u>, 364 N.C. 562, 566, 703 S.E.2d 723, 727 (2010).

"[T]o exercise its inherent power to enforce a settlement agreement, a district court (1) must find that the parties reached a complete agreement and (2) must be able to determine its terms and conditions."  <u>Hensley</u>, 277 F.3d at 540–41.  "If there is a factual dispute over the existence of an agreement, over the authority of attorneys to enter into the agreement, or over the

agreement's terms, the district court may not enforce a settlement agreement summarily." Id. at 541. If there is a factual dispute over the existence of an agreement or its terms, the district court must "conduct a plenary evidentiary hearing in order to resolve that dispute" and make findings. Id.; see also Sheppard v. Coleman, No. 4:19-CV-86-D, 2021 WL 6332356, at *3 (E.D.N.C. Nov. 10, 2021) (stating same principles as, and relying on, Hensley). "If a district court concludes that no settlement agreement was reached or that agreement was not reached on all the material terms, then it must deny enforcement." Hensley, 277 F.3d at 541.

## ARGUMENT

**I.      THE MOTION TO ENFORCE SETTLEMENT AGREEMENT IS PROPERLY DENIED BECAUSE THE PARTIES NEVER REACHED AGREEMENT AND, IF THEY DID, MR. HEWETT REPUDIATED THE ALLEGED AGREEMENT.**

"[A] valid contract requires (1) assent; (2) mutuality of obligation; and (3) definite terms." Charlotte Motor Speedway, LLC v. County of Cabarrus, 230 N.C. App. 1, 7, 748 S.E.2d 171, 176 (2013). "One of the essential elements of every contract is mutuality of agreement." Croom v. Goldsboro Lumber Co., 182 N.C. 217, 217, 108 S.E. 735, 737 (1921). The parties "must assent to the same thing in the same sense, and their minds must meet as to all the terms." Id. Therefore, "[i]f any portion of the proposed terms is not settled, or no mode agreed on by which they may be settled, there is no agreement." Id. Further, "[t]here is no meeting of the minds, and, therefore, no contract, when in the contemplation of both parties something remains to be done to establish contract relations." Parker v. Glosson, 182 N.C. App. 229, 232, 641 S.E.2d 735, 737 (2007) (quotation and ellipsis omitted).

The parties' intent to form a contract may be "manifested by words or conduct." See T.C. May Co. v. Menzies Shoe Co., 184 N.C. 150, 150, 113 S.E. 593, 594 (1922); see also Se. Caissons, LLC v. Choate Constr. Co., 247 N.C. App. 104, 114, 784 S.E.2d 650, 657 (2016) (trial

10

court properly considered parties' correspondence, unexecuted contract, parties' affidavits, and parties' conduct to conclude that there was no mutual assent). "The subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made even though a document was contemplated and has never been executed." N.C. Nat'l Bank v. Wallens, 26 N.C. App. 580, 584, 217 S.E.2d 12, 15 (1975).

The parties here discussed, but never reached, a settlement agreement because they never agreed "to the same thing in the same sense." See Croom, 182 N.C. at 217, 108 S.E. at 737. SaveAround's December 30 email was an "agreement to agree" that required future agreement by both parties to reach a settlement. The parties' conduct after the December 30 email confirms that they knew they had not reached agreement. And, after the December 30 email, the parties failed to reach agreement—SaveAround made settlement proposals, but Mr. Hewett rejected them. Even if the December 30 email was an agreement, Mr. Hewett repudiated it and cannot enforce it. Mr. Hewett's motion to enforce settlement agreement fails.

### A. SaveAround's December 30 Email Memorialized an Unenforceable "Agreement to Agree."

"The courts generally hold a contract, or offer to contract, leaving material portions open for future agreement is nugatory and void for indefiniteness." Boyce v. McMahan, 285 N.C. 730, 734, 208 S.E.2d 692, 695 (1974). When the parties agree to negotiate a settlement on specified terms, and then fail to agree to the terms, there is no valid contract. Chappell v. Roth, 353 N.C. 690, 692–93, 548 S.E.2d 499, 500 (2001). An "agreement to agree" is not enforceable. See Garland v. Orange County, 293 N.C. App. 232, 239, 900 S.E.2d 689, 695, review denied, 908 S.E.2d 826 (N.C. 2024). The December 30 email memorialized an agreement to agree, and it is thus insufficient to create an enforceable contract.

### 1. The content of the December 30 email makes clear that the parties had not reached agreement.

On its face, the December 30 email shows that the parties had not reached a complete agreement. Instead, both parties knew that "something remain[ed] to be done to establish contract relations." See Parker, 182 N.C. App. at 232, 641 S.E.2d at 737.

The December 30 email exchange is inconsistent with the parties having reached agreement. After reciting the general terms that SaveAround hoped would guide the parties' negotiations, SaveAround's counsel suggested delaying a discovery deadline to try to "finalize the settlement." Dagger Decl. ¶ 15. She noted that the settlement effort could "fall[] through," and, if so, the parties could "ask the court to reset the discovery schedule." Id. Mr. Hewett's counsel agreed to "push the deadline," and did not question that the settlement could fall through. Id. at ¶ 16. If the parties had an agreement, there would be no risk that settlement could fall through and that the parties would ask to "reset the discovery schedule." See id. at ¶ 15.

Further, the December 30 exchange shows that the parties contemplated reaching a written agreement before settlement became final. See id. SaveAround's counsel asked if Mr. Hewett's counsel would send a draft, id. at ¶¶ 15–16, and Mr. Hewett's counsel did, id. at ¶ 18. The parties did not tell the Court they had settled, id. at ¶ 17, because they had not.

These facts are similar to the relevant facts in Howard v. IOMAXIS, LLC, No. 18 CVS 11679, 2020 WL 2104823 (N.C. Bus. Ct. May 1, 2020), where the parties executed a memorandum of settlement, but the Business Court found no binding agreement. There, the parties requested a stay of litigation after executing the memorandum, but "the parties did not represent to the Court that a final settlement agreement had been reached." Id. at *8. Instead, they asked for time to "structure, finalize, and execute a formal settlement agreement" and presented a proposed order that would allow discovery to continue if the parties failed to finalize

12

the settlement, conduct that "strongly suggest[ed] that the Parties did not consider the [memorandum] to be a final and binding settlement agreement." Id. (quotation omitted). Here, the parties' communications about the need for time to "finalize the settlement," the possibility that settlement could fall through, and the prospect of asking to reset the discovery schedule are analogous to the parties' statements to the court in Howard, and show that the parties did not consider the December 30 email a binding agreement. See Dagger Decl. ¶¶ 15–16.

Other relevant case law also undermines Mr. Hewett's argument that the parties reached a complete agreement through SaveAround's December 30 email. In Garland, defense counsel sent an email "to memorialize the terms of the parties' settlement reached at today's mediated settlement conference" and promised to draft an agreement to circulate "for review and signature." 293 N.C. App. at 236, 900 S.E.2d at 693. Negotiations over the written agreement broke down. Id. The trial court granted the plaintiff's motion to enforce settlement based on defense counsel's email, but the Court of Appeals reversed. Id. The Court of Appeals concluded that the email was "insufficient to support formation of a contract" for multiple reasons. Id. at 239, 900 S.E.2d at 695. As relevant here, the Court of Appeals explained that, "because the email contemplates a future agreement for signature, it is at best an agreement to agree," which is not an enforceable contract. Id. (citing Boyce, 285 N.C. at 734, 208 S.E.2d at 695).

Following Garland, Judge Osteen recently rejected a party's argument that an email summarizing a list of terms for a license agreement was an enforceable contract. Tapp MFG, Inc. v. Speed UTV, LLC, No. 1:24-CV-944, 2026 WL 207480, at *7 (M.D.N.C. Jan. 27, 2026). In Tapp, the parties agreed by email that a "bullet-pointed list of terms" for a product license would serve "as an interim and/or supplemental agreement until we have the agreements drafted by our lawyers in place." Id. at *1. The court determined that no contract was formed through

this email exchange.  Id. at *6.  As in Garland, the exchange "expressly contemplates a future agreement for signature that will grant and govern the license . . . .  As such, the email is at best an agreement to agree."  Id. at *7 (quotations and citations omitted).

The cases Mr. Hewett cites do not support converting the December 30 email into a binding agreement.  See [D.E. 29] 8.  In Bryant v. Eastwood Construction, LLC, the court enforced a settlement agreement where—unlike here—the parties notified the court of a settlement, expressly stated in correspondence that a settlement was reached, executed a complete written settlement agreement, and did not contest that they reached complete agreement.  No. 1:23CV637, 2024 WL 4332553, at *2–8 (M.D.N.C. Sept. 27, 2024) (cited at [D.E. 29] 8).  In Petty v. Timken Corporation, it was "undisputed that [the defendant] made an offer of settlement, that the offer was communicated to [the plaintiff] by his counsel, that [the plaintiff] agreed to accept the settlement after conference with his attorney, and that [the plaintiff] reaffirmed his acceptance in open court."  849 F.2d 130, 132–33 (4th Cir. 1988) (cited at [D.E. 29] 8).  After stating in open court that he had settled, the plaintiff tried to back out, alleging that his lawyer's lack of preparation affected the settlement.  Id. at 132.  Based on the undisputed facts, the Fourth Circuit concluded that, "[c]learly, a settlement did exist," and it affirmed the district court's denial of the plaintiff's motion to vacate the settlement.  Id. at 133.

Mr. Hewett cites three additional cases where he says courts "enforced similar expressions of understanding between parties" [D.E. 29] 8, but those cases are not similar.  In Dean v. Jones, Judge Flanagan enforced a settlement agreement where the pro se plaintiff attempted to back out of an agreement reached on the record during a court-hosted settlement conference and memorialized in a written memorandum the same day.  No. 5:16-CT-3109-FL, 2022 WL 7454945, at *1–2 (E.D.N.C. Oct. 13, 2022) (cited at [D.E. 29] 8).  In USA Trouser,

14

<u>S.A. v. Andrews</u>, after the defendant filed a motion to enforce settlement agreement, the parties <u>jointly</u> requested that the court enforce their written memorandum of understanding, representing that they intended to be bound by it and that it included all material terms of their settlement. No. 1:11-cv-00244, 2016 U.S. Dist. LEXIS 3038, at *2–3 (W.D.N.C. Jan. 11, 2016) (cited at [D.E. 29] 8).  In <u>Bell v. Department of Homeland Security</u>, the parties signed a written agreement at mediation and the mediator notified the court that the case was "completely settled."  No. 16-CV-00732, 2019 WL 5700778, at *1 (W.D.N.C. Nov. 4, 2019) (cited at [D.E. 29] 8–9), <u>report and recommendation adopted</u>, 2019 WL 7374676 (W.D.N.C. Dec. 31, 2019).  The plaintiff admitted to signing the agreement at mediation, but said she thought she could back out because the agreement also required the parties to sign <u>another</u> agreement within seven days.  <u>Id.</u>  The court disagreed and enforced the signed settlement agreement.  <u>Id.</u> at *2.

Mr. Hewett's reliance on <u>Wallens</u> is also misplaced.  <u>See</u> [D.E. 29] 12.  There, the parties each signed and had notarized a written guaranty agreement.  <u>Wallens</u>, 26 N.C. App. at 583–84, 217 S.E.2d at 15.  The agreement provided that it "would [s]erve as an agreement until 'proper documents' could be drawn."  <u>Id.</u>  The Court of Appeals concluded that the parties' failure to later draw up and sign additional documents did not invalidate their signed, notarized agreement.  <u>Id.</u>  It was clear that the parties intended that document to be a binding contract, as they expressly stated that it "would [s]erve as an agreement."  <u>Id.</u>

Unlike the parties in <u>Bryant</u>, <u>Petty</u>, <u>Dean</u>, <u>U.S.A. Trouser</u>, and <u>Bell</u>, Mr. Hewett and SaveAround neither signed a settlement agreement in any form nor endorsed their settlements on the record in court.  <u>See</u> Dagger Decl. ¶¶ 17, 34.  And, in contrast to <u>Wallens</u>, the parties here never agreed that the December 30 email would serve as an agreement until they could draw up another one.  <u>See</u> <u>id.</u> at ¶ 15.  Rather, SaveAround expressed the terms to which it was "willing to

15

agree," asked Mr. Hewett's counsel to prepare an agreement, and planned for the possibility that negotiations could fall through.  Id.  As was true in Garland and Tapp, SaveAround and Mr. Hewett only reached an "agreement to agree," not an enforceable contract.

### 2. The parties' actions after the December 30 email confirm that the email was not a binding agreement.

The parties' conduct after the December 30 email confirms that neither party thought they had reached a binding settlement agreement.  See Wallens, 26 N.C. App. at 584, 217 S.E.2d at 15 (recognizing that "subsequent conduct and interpretation of the parties themselves may be decisive of the question as to whether a contract has been made").

#### a. Mr. Hewett tried to negotiate new material terms after the December 30 email.

After the December 30 email, Mr. Hewett proposed and tried to negotiate what he expressly characterized as "essential and material" terms—confidentiality and non-disparagement—not mentioned in SaveAround's December 30 email.  See Dagger Decl. ¶¶ 19, 21.  During the post-December 30 negotiations, Mr. Hewett's counsel insisted that "[c]onfidentiality and non-disparagement are both mutual and necessary terms of this Agreement," and said, "Plaintiff is unwilling to sign a non-confidential agreement."  Id. at ¶ 21 (emphases added).  Mr. Hewett's efforts to negotiate additional material terms contradict his argument that the parties agreed to all material terms in the December 30 email.  See [D.E. 29] 7.

Mr. Hewett repeatedly asserts that the non-disparagement and confidentiality provision was "non-material," id. at 2, 4, 7, 10, 13, 14, and accuses SaveAround of "using a manufactured dispute over an insignificant, non-material term in the formal agreement to attempt to squeeze a payment out of Mr. Hewett," id. at 10, and of trying to "make confidentiality a material term after the fact," id. at 8.  Mr. Hewett made confidentiality a material term by saying it was.

16

Dagger Decl. ¶¶ 19, 21; see Higbee v. Sentry Ins. Co., 253 F.3d 994, 998 (7th Cir. 2001) (concluding that, where plaintiff made clear during negotiations that she would not settle without confidentiality and non-disparagement clause, wording of that clause was material term that precluded enforceable settlement). He cannot now blame SaveAround for the positions he took.

The parties' continued negotiation of material terms after December 30 confirms that they knew SaveAround's December 30 email did not represent a complete agreement. Garland and Tapp are again instructive. In both cases, the parties repeatedly exchanged drafts of a settlement agreement after they memorialized terms in an email, showing that they were still negotiating. Garland, 293 N.C. App. at 239–40, 900 S.E.2d at 695; Tapp, 2026 WL 207480, at *9. Similarly, in Ray Lackey Enterprises, Inc. v. Village Inn Lakeside, Inc., the parties' continued negotiations after reaching a term sheet at mediation showed that "material aspects" of the term sheet "required further negotiation, thus making it void for indefiniteness." No. 14 CVS 2599, 2016 WL 393644, at *4 (N.C. Bus. Ct. Jan. 29, 2016).

Campbell v. Adkisson, Sherbert & Associates, 546 F. App'x 146 (4th Cir. 2013) (unpublished), does not support Mr. Hewett's argument that the December 30 email was a complete agreement on all material terms. See [D.E. 29] 11–12. In Campbell, the parties (ASA and Prospect) agreed on the material terms of settlement via a phone call between their counsel and memorialized them in an email. 546 F. App'x at 149, 153. Prospect then filed a motion informing the court that the parties "agreed to the principal terms of a settlement agreement, but require additional time to complete the drafting and execution of the settlement agreement." Id. at 149. The parties exchanged drafts of a written settlement agreement consistent with the oral agreement; Prospect added venue and choice-of-law provisions that ASA revised and Prospect accepted. Id. at 150, 153. Prospect's counsel then sent ASA's counsel a "final" copy of the

17

agreement and Prospect's tax identification number, asking that ASA sign and return the settlement agreement.  Id. at 150.  ASA returned the signed settlement agreement and mailed a settlement check.  Id.  The next day, Prospect filed another motion with the court representing that the parties "have concluded their settlement negotiations and now need to fully execute the Settlement Agreement."  Id.  Prospect told the court that no one with authority to sign for Prospect would be available for several days due to the holidays, so the parties required more time.  Id.  Instead, after the holidays, Prospect refused to sign the settlement agreement and returned the settlement check.  Id.

The district court in Campbell enforced the settlement agreement, finding that the parties agreed on the material terms by phone, and the agreement was not dependent on executing a writing; Prospect, of course, had informed the court that the parties had reached settlement before they prepared a written agreement.  Id. at 153; see id. at 149–50.  The district court found that the choice-of-law and venue terms (which were not part of the oral agreement) were not material.  Id. at 151.  Prospect argued on appeal that there was no complete agreement on all material terms on the phone call because the parties did not agree on the choice-of-law and venue provisions, and although they agreed on mutual releases, they had not yet finalized the releases in writing.  See id. at 152.  The Fourth Circuit saw no clear error in the district court's fact findings.  Id. at 153.  Relevant here, the Fourth Circuit found no error in the district court's finding that the choice-of-law and venue provisions were not material:  Prospect's "quick acceptance" of ASA's revisions to those terms "demonstrated that those provisions were not of 'paramount importance' to ASA."  Id.

This case is factually distinguishable from Campbell for many reasons, including that SaveAround never represented to the court that the parties had settled without a written

agreement (or at all), SaveAround never sent Mr. Hewett a "final" agreement for signature, and

SaveAround never told the court the parties had concluded their settlement negotiations and

simply needed to execute the agreement. See id. at 150. Also, the parties here never reached

complete agreement on all material terms. See id. at 153. Mr. Hewett cannot analogize to

Campbell by saying that confidentiality was not a "fundamental aspect of the settlement"

because he "subsequently agreed to SaveAround's confidentiality provision language."[3] See

[D.E. 29] 12 (citing Campbell, 546 F. App'x at 151). Unlike Prospect, see Campbell, 546 F.

App'x at 153, SaveAround did not quickly accept Mr. Hewett's addition of what he characterized

as an "essential and material" term, see Dagger Decl. ¶¶ 19, 21. SaveAround rejected the new

term completely. See id. at ¶¶ 20, 22, 25; see also Tran v. Novo Nordisk Pharm. Indus. Inc., No.

5:14-cv-254-FL, 2016 WL 1559137, at *6–7 (E.D.N.C. Apr. 18, 2016) (concluding that no

settlement was reached where parties agreed to execute mutually acceptable release but plaintiff

rejected proposed release in its entirety, instead of accepting "relatively minor" revisions as in

Campbell). Nor did Mr. Hewett quickly accept SaveAround's removal of that term; to the

contrary, Mr. Hewett reinserted it and said he would not sign an agreement without it. Dagger

Decl. ¶ 21. Mr. Hewett later had second thoughts about insisting on confidentiality, but his

actions and words demonstrate that it was a material term. See id. at ¶¶ 19, 21.

Finally, it makes sense that Mr. Hewett would consider confidentiality and non-

disparagement a material term. This case is his sixth TCPA lawsuit since 2022. Id. at ¶ 6; [D.E.

33-2] 9. He and his counsel may reasonably perceive that, if SaveAround can disclose that

---

[3] SaveAround did not propose "confidentiality provision language." See [D.E. 29] 12.
SaveAround understands Mr. Hewett's reference to "SaveAround's confidentiality provision
language" to mean no confidentiality language. See id.

19

Mr. Hewett settled this case for no payment after falsely denying that he signed up for text messages, future defendants will look for similar conduct in his cases against them.

> b. Mr. Hewett's communications when he asked SaveAround to revive its January 5 proposal make clear that the parties had not already reached agreement.

The communications surrounding Mr. Hewett's request to revive SaveAround's January 5 settlement proposal also show that the parties knew they had not reached agreement. See Croom, 182 N.C. at 217, 108 S.E. at 737 ("There must be neither doubt nor difference between the parties."). When SaveAround said it had chosen to continue to defend the case, Mr. Hewett did not immediately assert that the parties had already settled. See Dagger Decl. ¶ 26. Rather, his counsel asked whether SaveAround "would be amenable to signing" its January 5 proposal, which Mr. Hewett had previously rejected. Id. If Mr. Hewett thought the parties already had a binding agreement, there would have been no reason to ask whether SaveAround was "amenable to signing" the January 5 proposal. See id. Mr. Hewett's counsel's question also makes plain that Mr. Hewett had not agreed to the January 5 proposal—his counsel had to check whether he "could get [Mr. Hewett] to agree to the same[.]" Id. Consistent with this unsettled state of affairs, SaveAround's counsel's responded, "[I]f your client says he will agree to it, I will take that proposal back to my client," again making clear that the parties had not reached agreement. Id. at ¶ 27. Mr. Hewett's counsel did not then assert that the proposal should not go back to SaveAround because the parties had already reached agreement. See id. at ¶¶ 27–28.

It was only after SaveAround refused to revive the January 5 proposal that Mr. Hewett claimed, for the first time, that the parties had already reached a settlement. Id. at ¶¶ 29–30. That claim cannot overcome the parties' conduct and communications showing otherwise. See, e.g., Cole v. Champion Enters., Inc., 496 F. Supp. 2d 613, 627 (M.D.N.C. 2007) (concluding that

20

parties' conduct after alleged oral agreement was formed showed there was no binding agreement, where parties continued to negotiate and did not purport to believe that there was already a binding oral agreement), aff'd, 305 F. App'x 122, 129 (4th Cir. 2008) (unpublished).

**B. The Parties Did Not Reach Agreement After December 30, and Mr. Hewett Cannot Force SaveAround to Revive the January 5 Proposal He Rejected.**

Mutual assent, "or meeting of the minds, requires an offer and acceptance in the exact terms and that the acceptance must be communicated to the offeror." Normile v. Miller, 313 N.C. 98, 103, 326 S.E.2d 11, 15 (1985). "An acceptance is an essential element of a contract because it manifests the offeree's intent to be bound by the terms of the offer." Exec. Leasing Assocs. v. Rowland, 30 N.C. App. 590, 592, 227 S.E.2d 642, 644 (1976). "If the terms of the offer are changed or any new ones added by the acceptance, there is no meeting of the minds and, consequently, no contract." Normile, 313 N.C. at 103, 326 S.E.2d at 15. Therefore, a "counteroffer amounts to a rejection of the original offer." Id. Once an offeree rejects an offer, the offeree's power of acceptance is terminated. Restatement (Second) of Contracts § 36 (2024 update). These principles foreclose any argument that the parties reached agreement after the December 30 email.

To the extent that SaveAround's December 30 email is sufficiently definite to be construed as an offer to contract, Mr. Hewett rejected it by proposing new terms, confidentiality and non-disparagement, in his written agreement on the same date. See Dagger Decl. ¶¶ 18–19; see also Normile, 313 N.C. at 104, 326 S.E.2d at 15 (concluding that there was no acceptance where offeree responded by "chang[ing] the original offer in several material respects"). SaveAround rejected Mr. Hewett's December 30 proposal when it sent its January 5 "counter proposal"; Mr. Hewett rejected the January 5 proposal by again proposing different terms on January 6. See Dagger Decl. ¶¶ 20–21. Each time the parties exchanged proposed agreements

21

that "worked a modification of the proposed terms," they "reject[ed] the prior iteration of the proposed terms."  See Tapp, 2026 WL 207480, at *7; see also Garland, 293 N.C. App. at 239-40, 900 S.E.2d at 695 (concluding that no settlement was reached where "plaintiff did not agree to the terms of defendant's proposed settlement agreement"; instead, plaintiff's counsel proposed changes to agreement, "effectively rejecting defendant's offer and proposing a new agreement").

Having rejected SaveAround's January 5 settlement proposal, Mr. Hewett could not accept that offer later or force SaveAround to reinstate it.  See Restatement (Second) of Contracts § 36 (2024 update).  For example, in Garland, the plaintiff attempted to accept the defendant's initial settlement agreement five days after the plaintiff proposed revisions to it.  293 N.C. App. at 240, 900 S.E.2d at 695.  Because the revisions operated as a rejection, the Court of Appeals concluded that the plaintiff could not later accept the defendant's offer.  Id. (citing Normile, 313 N.C. at 104, 326 S.E.2d at 15).  Likewise, here, Mr. Hewett rejected SaveAround's January 5 settlement offer.  See supra p. 21.  His belated attempt to accept that offer is ineffective.  See Dagger Decl. ¶¶ 26–30; Garland, 293 N.C. App. at 240, 900 S.E.2d at 695.

### C.    Even If Mr. Hewett Could Show that the December 30 Email Was a Contract, He Could Not Enforce It Because He Repudiated It.

Where a binding contract exists between two parties, a party may breach the contract by repudiation, which "is a positive statement by one party to the other party indicating that he will not or cannot substantially perform his contractual duties."  Millis Constr. Co. v. Fairfield Sapphire Valley, Inc., 86 N.C. App. 506, 510, 358 S.E.2d 566, 569 (1987).  Anticipatory repudiation excuses the non-breaching party from performance.  Id.

Here, even if Mr. Hewett could show that SaveAround's December 30 email was a binding agreement—which SaveAround denies, see supra section I.A—Mr. Hewett repudiated that agreement.  Assuming SaveAround's December 30 proposal constituted a binding contract

22

containing all material terms, that alleged contract did not include confidentiality; thus, it would have been a non-confidential agreement. Dagger Decl. ¶ 15. On January 6, 2026, Mr. Hewett made a positive statement that he would not perform what he now alleges was his contractual duty when his counsel asserted that Mr. Hewett was "unwilling to sign a non-confidential agreement." Id. at ¶ 21. In doing so, Mr. Hewett gave notice that he would not honor the non-confidential agreement purportedly reached on December 30. See Dixon v. Kinser, 54 N.C. App. 94, 101, 282 S.E.2d 529, 534 (1981) ("[W]hen a party to a contract gives notice that he will not honor the contract, the other party to the contract is no longer required to make a tender or otherwise perform under the contract because of the anticipatory breach of the first party.").

Because Mr. Hewett repudiated the supposed December 30 agreement, SaveAround was excused from performing it. See id. at 103, 282 S.E.2d at 535 (concluding that defendant was excused from performance after plaintiff, through counsel, notified defendant "that she would not go through with the agreement"); see also, e.g., Se. Brunswick Sanitary Dist. v. City of Southport, No. COA09-1369, 2011 WL 340535, at *8 (N.C. Ct. App. Feb. 1, 2011) (unpublished) ("Since the undisputed evidence establishes that the District notified the City that it would not perform the Contract unless the City agreed to amend the terms of the Contract, the District repudiated the Contract, and the City was no longer obligated to perform under the Contract."). Mr. Hewett cannot now enforce a repudiated contract. See Millis, 86 N.C. App. at 510–12, 358 S.E.2d at 569–70 (reversing and remanding with instruction for trial court to instruct jury on anticipatory repudiation defense, which may have excused defendant's performance and prevented finding that defendant breached contract); Beeson v. McDonald, 82 N.C. App. 669, 671–72, 347 S.E.2d 485, 486–87 (1986) (reversing and remanding for dismissal of plaintiff's claim for specific performance where plaintiff had repudiated contract he sought to enforce).

23

## II. SAVEAROUND DOES NOT OBJECT TO DISMISSAL OF THE ACTION WITH PREJUDICE, BUT MR. HEWETT'S ATTEMPT TO IMPOSE ADDITIONAL TERMS ON THE DISMISSAL IS PROPERLY REJECTED.

Mr. Hewett moves, in the alternative, for dismissal of this action with prejudice. [D.E. 29] 14–15. Courts will generally grant a voluntary dismissal of a plaintiff's claim where there is no threat of legal prejudice to the defendant. Ellett Bros. v. U.S. Fid. & Guar. Co., 275 F.3d 384, 388 (4th Cir. 2001). "[A] motion for voluntary dismissal with prejudice should be granted absent evidence of collusion, an imminent decision on the merits, or other extraordinary circumstances." Bioxy, Inc. v. Birko Corp., 935 F. Supp. 737, 740 (E.D.N.C. 1996) (emphasis added); see also Metro Media Ent., LLC v. Steinruck, No. 12-cv-0347, 2014 WL 4268838, at *2 (D. Md. Aug. 27, 2014) ("Where, as here, a plaintiff's Rule 41(a)(2) motion 'specifically request[s] dismissal with prejudice, it has been held that the district court must grant that request.'" (alteration and emphasis in original) (quoting 9 Charles A. Wright & Arthur R. Miller § 2367 (3d ed. 2008))).

SaveAround does not anticipate that it would be prejudiced in any way if this Court were to dismiss Mr. Hewett's action with prejudice. Accordingly, SaveAround does not oppose Mr. Hewett's alternative request for dismissal with prejudice of this action, to the extent the relief is limited to that dismissal.

However, to the extent that Mr. Hewett asks that dismissal be granted "according to the terms of the parties' agreement, including releases of claims with no monetary payment," [D.E. 29] 3, that request fails because the parties did not reach agreement. See supra section I.

### CONCLUSION

For the reasons stated above, SaveAround respectfully requests that the Court deny Mr. Hewett's motion to enforce settlement agreement, and deny Mr. Hewett's alternative request for dismissal with prejudice to the extent he seeks dismissal "according to the terms of the

24

parties' [alleged] agreement, including releases of claims with no monetary payment." [D.E. 29] 3. SaveAround intends, if it prevails on the merits, to seek its reasonable attorneys' fees because Mr. Hewett "knew, or should have known, that the action was frivolous and malicious." See N.C. Gen. Stat. § 75-105(d). SaveAround does not oppose dismissal with prejudice of Mr. Hewett's claims.

This is the 17th day of March, 2026.

ELLIS & WINTERS LLP

/s/ Kelly Margolis Dagger
Kelly Margolis Dagger
N.C. State Bar No. 44329
Marie Scheperle
N.C. State Bar No. 64748
Chelsea Pieroni
N.C. State Bar No. 59816
P.O. Box 33550
Raleigh, NC 27636
Telephone: (919) 865-7000
Facsimile: (919) 865-7010
kelly.dagger@elliswinters.com
marie.scheperle@elliswinters.com
chelsea.pieroni@elliswinters.com

*Counsel for Defendant Enjoy the
City North, Inc. d/b/a SaveAround*